Filed 8/27/20  P. v. Magee CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LOUIS TRUMAN MAGEE,<br><br>Defendant and Appellant. | F077067<br><br>(Super. Ct. No. BF168256A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua and Michael G. Bush, Judges.†

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Jennifer Oleksa and Cavan M. Cox, II, Deputy Attorneys General, for Plaintiff and Respondent.

---

†       Judge John W. Lua denied defendant's Penal Code section 1181.1 motion and presided over defendant's trial and sentencing; Judge Michael G. Bush denied defendant's Penal Code section 995 motion.

-ooOoo-

# INTRODUCTION

Defendant Louis Truman Magee was charged with and convicted by jury of the attempted premeditated murder of his former fiancée (Pen. Code, §§ 664/187/189; count 1),[1] stalking (§ 646.9, subd. (b); count 2), making criminal threats (§ 422; count 3), two counts of contempt of court for violating a protective order (§ 166, subd. (c)(4); counts 4 & 5), assault on a peace officer (§ 245, subd. (c); count 6), evading a peace officer (Veh. Code, § 2800.2; count 7), and misdemeanor hit and run (Veh. Code, § 20002, subd. (a); count 8). Defendant was sentenced to an indeterminate term of life in prison with the possibility of parole for attempted premeditated murder, consecutive to a total determinate term of seven years four months as follows: the upper term of five years for assault on a peace officer, one year for stalking, eight months for the first count of violating a protective order, and eight months for evading a peace officer. The court imposed concurrent terms of three years each for making criminal threats and for the second count of violating a protective order, and a concurrent term of 180 days in jail for misdemeanor hit-and-run.

On appeal, defendant challenges his conviction on count 1 for attempted premeditated murder and his convictions on counts 4 and 5 for violating a protective order. As to count 1, defendant claims the trial court erred when it denied his motion for acquittal under section 1118.1 and the jury's verdict is not supported by substantial evidence of intent to kill, commission of an overt act, or premeditation. As to counts 4 and 5, he claims the trial court erred when it omitted two elements from its instruction to the jury on section 166, subdivision (c)(4).

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2.

The People dispute defendant's entitlement to relief from his conviction for attempted premeditated murder, but they agree the court erred in instructing the jury on violation of a protective order under section 166, subdivision (c)(4).

We reject defendant's claim that the trial court erred in denying his section 1118.1 motion and find substantial evidence supports his conviction for attempted premeditated murder. However, we concur with the parties that the trial court erred when it instructed the jury, we find the error prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), and, as explained *post*, we accept the parties' concession and modify the verdicts on counts 4 and 5 to reflect misdemeanor convictions under section 166, subdivision (c)(1). Finally, on our own motion, we order the trial court to correct the clerical error in the abstract of judgment addressed in part III. of the Discussion.

Except as modified, the judgment is affirmed.

## FACTUAL SUMMARY

### I.     Prosecution Case

#### A.     Background

Defendant and his former fiancée, L.S., were together for three years before breaking up in September 2016. At that time, they lived in L.S.'s apartment in Bakersfield and she permitted him to continue living there for a while because he had nowhere to go. L.S. testified that they did not get back together, but after she moved in with her cousin next door, she brought him food because he was not working and he did not have the key to the apartment so she would have to let him in sometimes.

At the beginning of January 2017, L.S. obtained a restraining order against defendant. On January 7, 2017, defendant called her more than five times from his own phone and from blocked phone numbers, even though she had changed her phone number. L.S. testified that defendant threatened to kill her and then himself, and she feared for her safety. He also left a voicemail message stating, "Answer your phone,

bitch." L.S. called 911 and reported that defendant kept calling her, including at her job, despite the restraining order.

On January 25, 2017, defendant called L.S. more than 10 times from different phone numbers and left messages. She testified he also came over to the apartment and threw rocks at the window to get her to come out. L.S. called 911 in fear and reported that defendant kept calling her, in violation of the restraining order. Officer Vining, who responded to the call, testified that he saw approximately 28 missed calls on L.S.'s call log from unknown numbers and also saw text messages from unknown numbers. L.S. told Vining that she sometimes received calls at work from unknown numbers and that she had changed her phone number in the past because defendant was contacting her.

When her lease expired in January 2017, L.S. moved in with her cousin, A.W., who lived in the apartment next door.

## B. Charged Events

### 1. Incident on May 1, 2017

On May 1, 2017, L.S. was hanging out at the apartment with A.W. and another cousin, A.G. Earlier in the day, defendant texted L.S. and made comments regarding where she was and what she was wearing, which caused her to believe he was following her. L.S. later received a call from defendant telling her he was outside and he wanted her to come out. She testified that he threw a rock at the bedroom window and she saw him outside driving with his lights off, running up and down the stairs, and hiding around bushes. L.S. testified that she feared for her life because prior to showing up, defendant threatened over the phone to harm her and himself. A.G. heard defendant threaten to kill L.S. when the phone was on speaker, and when defendant showed up, A.G. called 911 before turning the call over to L.S. It was dark outside, and L.S. reported defendant had his lights off and she did not know where he was.

The entrance gate into the apartment complex was not working at the time and, when the police arrived, L.S. left the apartment to trigger the exit gate with her car so that

4.

police could enter the complex. After L.S. got into her car, defendant pulled up behind her in his car, blocking her in. He bumped the rear of her car with the front of his car and then drove toward the exit gate.

Officers Glenn and Salazar arrived at the apartment complex in response to the 911 call shortly after 11:30 p.m. Someone drove out of the complex, which allowed Glenn to drive the patrol car in through the exit gate. Several other responding patrol cars remained outside of the gate. Glenn and Salazar heard screaming and cries for help from a group of women. Someone yelled, "'That's him,'" and pointed toward defendant's car, which was then behind L.S.'s car blocking it in. Glenn parked the patrol car and Salazar was in the processing of exiting from the passenger side when defendant turned his car toward them and accelerated at a high rate of speed. Glenn testified that Salazar "dove" back into the patrol car and if she had not done so, defendant would have hit her with his vehicle. Glenn thought defendant was going to hit their patrol car head on and braced for impact. Defendant drove to the exit gate, however, and while he waited for it to open, Glenn turned the patrol car around and pulled behind defendant.

Glenn and Salazar followed defendant out of the apartment complex. During the ensuing pursuit, defendant ran multiple red lights at high speed and once he was on the highway, he accelerated up to 115 miles per hour. At one point, he lost control of his car and hit a cement guardrail. After they broke off the pursuit for safety reasons, Glenn and Salazar returned to the apartment complex and spoke with L.S., A.G., and A.W. While the officers were there, defendant called L.S.'s phone and she answered. Defendant then spoke to Glenn and identified himself as the individual involved in the pursuit. Defendant agreed to meet Glenn at the Kmart parking lot but when Glenn responded to that location, defendant failed to show up.

### 2. Incident on May 9, 2017

L.S. moved out of her cousin's apartment shortly thereafter. Subsequently, on May 9, 2017, A.W. was asleep in the bedroom she and L.S. had shared before L.S.

5.

moved out. A.W. heard defendant jiggle the door and call for L.S. Defendant threw rocks at the bedroom window and A.W. heard him at the window. After A.W. heard a loud bang against the window, she feared he was going to break in and called 911. A.W. testified that she told defendant L.S. was not there and he would become silent for a while before returning. A.W. stated that defendant had behaved similarly on other occasions and she would wait for him to leave, but this time "felt different" and she feared for her life.

Multiple officers, including Glenn and Salazar, were dispatched to A.W.'s apartment at approximately 2:45 a.m. They searched the apartment complex and Glenn located defendant hiding in the backseat of his car, which was backed into a parking stall. From that position, defendant had a direct view of A.W.'s apartment, including the door, windows, and stairwell to the apartment, which was on the second story. Salazar located a bag in the front seat of the car that contained a large, fixed-blade butcher knife, duct tape, yellow rubber dishwashing gloves and multiple large trash bags. The items appeared to be new. Salazar also observed what appeared to be fresh smudge marks consistent with fingerprints on the bedroom window.

Officer Glenn testified that defendant admitted he knew there was a restraining order against him, admitted he had threatened to kill L.S. on May 1, 2017, and stated that he and L.S. had a "negatively reinforced relationship." Defendant expressed he was upset because he believed that L.S. had been unfaithful to him and that he had sacrificed a lot for her. Glenn also testified that defendant first said he had the items in his car because his aunt was getting rid of things, but he later admitted that he brought them to L.S.'s apartment "in order to have a discussion with [her]."

## II. Defense Case

Officer Yeary responded to L.S.'s 911 call on January 7, 2017. Yeary testified that L.S. did not report that defendant was physically present, that defendant threatened to kill her or himself, or that she had voicemails or texts from him threatening to kill her;

6.

and Yeary did not take a photo of any text messages. Yeary did not recall if L.S. described an incident where defendant grabbed her arm, but Yeary did not document such an incident in her report. On cross-examination, Yeary confirmed that there was a valid restraining order in place on January 7, 2017, L.S.'s cell phone showed 10 missed calls from blocked numbers, L.S. told her defendant often called from blocked numbers, and L.S. played a voicemail from defendant in which he stated, "'Answer your phone, bitch.'"

Officer Salazar testified that she did not recall L.S. telling her that defendant walked up the stairs to the apartment on May 1, 2017, that he hid by the bushes and the pool area, or that he threw rocks at the window; and that information was not documented in Officer Glenn's report. On cross-examination, Salazar testified that both L.S. and A.G. appeared stressed out on May 1, 2017.

Finally, defendant's cousin, L.R., testified that defendant lived with her in Los Angeles between January or February 2017 and April 2017. During that time, L.R. saw and heard defendant and L.S. conversing by video call and on speaker phone. L.R. heard L.S. initiate a phone call to defendant in April 2017, and L.S. and defendant would talk like "boyfriend and girlfriend" during calls.

L.R. testified that in April 2017, her mother wanted some household items removed from the house they shared, and they asked defendant to help and to straighten up outside in the yard. They gave him trash bags and tape to pack things and yellow rubber gloves because the task was dirty. On cross-examination, L.R. said they used a knife and scissors; the filled, taped bags of items were taken to Goodwill in Los Angeles; and defendant used the rubber dish gloves because it was dirty and dusty outside.

## III. Rebuttal

On rebuttal, Officer Salazar testified that the yellow rubber gloves she seized from defendant's car appeared to be brand new and did not have any dirt or dust on them. The trash bags also appeared to be brand new.

7.

# DISCUSSION

## I.      Substantial Evidence Claim

With respect to the attempted premeditated murder of L.S., defendant claims that the trial court erred in denying his motion to set aside the information under section 995 and his motion for acquittal under section 1118.1, made at the close of the People's case-in-chief; and that his conviction is not supported by substantial evidence.[2]  The People contend that there was no error and the jury's verdict on count 1 is supported by substantial evidence.  We agree with the People.

### A.      Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense[]" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357).  On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio*, *supra*, at p. 357.)

---

[2]      Despite defendant's mention of the erroneous denial of his section 995 motion, we do not interpret his brief as advancing an appellate claim based on the denial of the motion and, therefore, we confine our discussion to the sufficiency of the evidence supporting the jury's verdict on count 1.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 140 [a defendant cannot establish denial of section 995 motion was prejudicial error where conviction supported by substantial evidence].)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….'" (*People v. Nguyen*, *supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio*, *supra*, at p. 357.)

This standard of review applies to a trial court's ruling on a motion for judgment of acquittal under section 1118.1. (*People v. Dalton* (2019) 7 Cal.5th 166, 249, citing *People v. Stevens* (2007) 41 Cal.4th 182, 200; accord, *People v. Houston* (2012) 54 Cal.4th 1186, 1215.) "'"'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case." [Citations.] The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review.'" (*People v. Dalton*, *supra*, at p. 249, quoting *People v. Stevens*, *supra*, at p. 200; accord, *People v. Houston*, *supra*, at p. 1215.)

### B.     Elements of Attempted Premeditated Murder

"An attempt to commit a crime consists of two elements:  a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) While murder is an unlawful killing with express *or* implied malice aforethought (§§ 187, subd. (a), 188; accord, *People v. Rangel* (2016) 62 Cal.4th 1192, 1220), attempted murder requires specific intent to kill, or express malice, "'and the commission of a direct but ineffectual act toward accomplishing the intended killing'" (*People v. Smith* (2005) 37

9.

Cal.4th 733, 739; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654).[3]  Express malice is shown when the defendant "'either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.'" (*People v. Houston*, *supra*, 54 Cal.4th at p. 1217; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

"For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8 (*Decker*); accord, *People v. Garton* (2018) 4 Cal.5th 485, 514 (*Garton*).)  "[E]vidence of motive is often probative of intent to kill[,]" but it "is not required to establish intent to kill[.]" (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)  Intent "may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Ibid.*)

Unlike murder, "attempted murder is not divided into degrees, but the sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation." (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 654.)  More than a specific intent to kill is required to support a finding of deliberation and premeditation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*Ibid.*)  "'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.…" [Citations.]'" (*Ibid.*)

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [(*Anderson*)], [the Supreme] [C]ourt reviewed earlier decisions and developed guidelines to aid reviewing courts in

---

[3]  Section 188 was amended effective January 1, 2019, but that amendment is not relevant to the issues raised in this appeal.  (Stats. 2018, ch. 1015, § 2, p. 3.)

10.

assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [The court] described three categories of evidence recurring in those cases: planning, motive, and manner of killing." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) "[H]owever, '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.'" (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1081; accord, *People v. Casares* (2016) 62 Cal.4th 808, 824, disapproved on another ground by *People v. Dalton*, *supra*, 7 Cal.5th at p. 214.) The "guidelines are descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight." (*People v. Halvorsen*, *supra*, at p. 420; accord, *People v. Casares*, *supra*, at p. 824.).)

### C. Analysis

#### 1. Attempted Murder Conviction

##### a. Intent to Kill

Defendant argues that there is insufficient evidence supporting the jury's finding that he acted with intent to kill L.S., and he characterizes the evidence that he made "a credible threat" against her on May 1, 2017, as "dubious." Relying on *People v. Miller* (1935) 2 Cal.2d 527 (*Miller*), discussed below, defendant contends that regardless, making a threat is not necessarily sufficient to prove intent to kill and "the law cannot assume that [his] presence at the apartment complex would 'ripen into a criminal act.'" In reference to evidence that he showed up other times trying to get L.S.'s attention and that he would sometimes sleep on the apartment complex grounds, he also contends there is no indication his presence at the complex on May 9, 2017, was restricted to that night or related to an intent to kill.

We find defendant's arguments unpersuasive. Issues of witness credibility are reserved for the trier of fact, and although the jury might have concluded that L.S., A.G., and A.W. lacked credibility and rejected their version of events, it was not compelled by the evidence to do so. As discussed, our task on review is confined to determining

11.

whether, viewed in the light most favorable to the prosecution, the jury's verdict is supported by substantial evidence.

### 1)        Evidence Sufficient

In this case, there is evidence that between the time L.S. obtained a restraining order against defendant in early January 2017 and May 1, 2017, he threatened to kill her and himself, he threatened to harm anyone who stood in his way, he threatened to show up at L.S.'s place of employment, and he repeatedly harassed her.  L.S. testified that on May 1, 2017, defendant threatened to harm her prior to showing up at the apartment complex and she feared for her life, A.G. testified that she heard defendant threaten to kill L.S. that day, and Officer Glenn also testified that defendant admitted threatening to kill L.S. on May 1, 2017.  That specific threat to kill, which also underpinned the stalking and criminal threats counts, was highlighted by the prosecutor during closing when she argued that defendant showed up on May 9, 2017, with the intent to kill L.S.

L.S. denied inviting any contact by defendant or engaging with him, and she testified unequivocally that she feared for her safety and believed defendant was capable of killing her.  She changed her phone number repeatedly in an effort to keep defendant from contacting her, but he would find out her new number; and during the time period in question, he flooded L.S. with repeated calls and texts from different blocked numbers, including calling her place of employment.  L.S. testified that she was afraid to be alone and she stayed with different family members to avoid being found by defendant, and that after her apartment lease expired, she moved in with her cousin so she would not be alone.  L.S. said defendant would "spy" on her and she described a park-like area in the apartment complex where he would sleep.  When she called the police, he would hide in the complex and then return after police left.  She also described living under such stress that she was unable to sleep or think straight, she was always concerned that he might be outside the apartment, and she eventually left her job due to the stress and fear defendant would show up there.

Against this backdrop, defendant made clear to L.S. through phone calls and texts that he was following her on May 1, 2017, and he threatened to harm her and himself. He then showed up at L.S.'s and A.W.'s apartment, where L.S. and A.G. saw him driving around without his headlights on. Defendant called L.S. and wanted her to come outside. L.S. feared for her life and her cousin called 911. When L.S. went to her car so she could trigger the exit gate to let the police in, defendant drove up behind her and tapped her car with his.

Defendant then drove directly at Officer Salazar before initiating a high speed pursuit with the police. Despite the fact that he was being pursued by the police, defendant called L.S. multiple times and even spoke once with Officer Glenn.

The events on May 1, 2017, caused L.S. to move out of the apartment she shared with A.G. in fear and she testified that she planned to go somewhere defendant could not find her. On May 9, 2017, L.S. had already moved out, but defendant was not aware of this and he once again drove into the gated apartment complex looking for L.S. It was the middle of the night. A.W., who had been asleep, testified that she heard defendant rattle the front door and the window of the bedroom she and L.S. shared before L.S. moved out. Defendant called out for L.S. even though A.W. told him L.S. was not there, and he threw rocks at the window until he hit it so hard with something that A.W. called the police in fear he was going to get into the apartment.

After police arrived, they found defendant hiding in the backseat of his car, which was backed into a parking stall in a position that allowed defendant to see the door, the windows and the stairwell leading up to the apartment. On the front seat of the car was a bag containing items that would enable him to commit a killing: a large butcher knife, duct tape, gloves and trash bags. During interrogation, defendant admitted that he was upset with L.S., that he had threatened to kill her on May 1, 2017, and that he brought the items with him "to have a discussion with [her]."

13.

This evidence, viewed in the context of defendant's ongoing obsessive, abusive behavior toward L.S. and his threats to kill her, overwhelmingly supports the jury's finding that on May 9, 2017, defendant acted with the intent to kill L.S. Defendant's contrary argument requires that we view the evidence in the light most favorable to him and conclude that he intended only to get L.S.'s attention on May 9, 2017, that his presence may be attributed to his pattern of lurking around the apartment complex or sleeping in its park, and that the bagged items "are also consistent with innocent household use or unrelated to [L.S.] or to attempted murders." These arguments disregard the applicable standard of review and we reject them.

### 2)    *Miller* Decision

Defendant's reliance on *Miller* is of no assistance. In *Miller*, the defendant, who was white, threatened to kill the victim, who was black, for "annoying [the defendant's] wife." (*Miller*, *supra*, 2 Cal.2d at p. 529.) The threat was made at the post office in the presence of third parties, but not the victim. (*Ibid.*) The victim was employed by the Booneville town constable and when the defendant entered the constable's hop field with a rifle that afternoon, the constable was 250 to 300 yards away and the victim was 30 yards beyond the constable. (*Ibid.*) The defendant walked toward the constable and stopped 100 yards in, apparently to load his rifle. (*Ibid.*). The victim fled during this time and the defendant, without ever raising his weapon, continued walking toward the constable, who took the rifle from the defendant without any resistance. (*Ibid.*)

The jury convicted the defendant of attempted murder, but the California Supreme Court deemed the evidence of intent insufficient and reversed the conviction, stating, "In the present case, up to the moment the gun was taken from the defendant no one could say with certainty whether the defendant had come into the field to carry out his threat to kill [the victim] or merely to demand his arrest by the constable. Under the authorities, therefore, the acts of the defendant do not constitute an attempt to commit murder." (*Miller*, *supra*, 2 Cal.2d at p. 532.) The court also found the trial court committed

14.

prejudicial instructional error regarding the element of intent, but its holding rested on the insufficiency of the evidence. (*Id.* at pp. 532–533.)

Assuming *Miller* would be decided the same way today with respect to the sufficiency of the evidence, the decision is readily distinguishable.[4] The court's determination was expressly informed by the facts that the defendant was upset not only at the victim, but with law enforcement's inaction and that the defendant walked directly up to the constable before giving up his rifle without resistance. (*Miller*, *supra*, 2 Cal.2d at p. 532.) In this case, defendant communicated his threats directly to the victim, he went to what he believed was her place of residence, and there was no ambiguity resulting from third party involvement, let alone third party law enforcement involvement. Accordingly, the decision in *Miller* is inapt.

### b. Overt Act

Defendant also challenges the sufficiency of the evidence that he committed an overt act toward the commission of L.S.'s murder. In the trial court, the parties argued over the applicability of the decision in *People v. Morales* (1992) 5 Cal.App.4th 917 (*Morales*) in the context of defendant's motions under sections 995 and 1118.1, and the judge who denied defendant's section 995 motion was expressly persuaded by the opinion. However, defendant contends that reliance on *Morales* is misplaced because the decision was informed by the "'slight acts'" rule, which does not apply in this case given that "evidence of [his] intent to kill [L.S.] was weak, inconsistent and unsupported by the testimony."

---

[4]     "'Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court.'" (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at pp. 197–198, quoting *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### 1)    **"Slight Acts" Rule**

"When a defendant's intent is '"clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime."'" (*People v. Davis* (2009) 46 Cal.4th 539, 606, quoting *People v. Memro* (1985) 38 Cal.3d 658, 698, overruled on another ground by *People v. Gaines* (2009) 46 Cal.4th 172, 182, fn. 2.) Here, as discussed, defendant's intent to kill L.S. is clearly shown by the evidence and, therefore, we are unpersuaded by his argument that the "'slight acts'" rule is inapplicable.

In the early morning hours of May 9, 2017, defendant drove to and entered the gated apartment complex where he believed L.S. lived. He brought with him tools capable of muffling and restraining L.S., killing her, and hiding or disposing of evidence; and he had a direct line of sight to the apartment from his car. A.W. testified that she heard defendant jiggling the front door and bedroom window, causing her to believe he was trying to get inside the apartment, and Officer Salazar testified the window was dirty and she saw fresh smudge marks consistent with fingerprints. A.W. also testified that defendant threw rocks at the window and called for L.S., unaware that she had moved out. Defendant's presence at what he believed was the victim's apartment, his repeated attempts to make contact with her and his possession of tools to commit murder speak to more than a mere preparation to commit murder, and we reject his contrary argument.

### 2)    *Morales* **Decision**

The parties disagree whether the decision in *Morales* is analogous and given their focus on the case in the trial court and on review, we address it. The defendant in *Morales* had a history of heavy drinking (*Morales*, *supra*, 5 Cal.App.4th at p. 920) and, on the day of the crime, he told his estranged wife over the phone that he was "'going to get'" her boyfriend (*id.* at p. 921). Shortly thereafter, the defendant showed up at his estranged wife's house, pointed a gun in her face and told her, "'I am going—I am going

to go get your boyfriend.  Then I am going to come back for you.'"  (*Ibid.*)  Her boyfriend called during this time, and she warned him that the defendant had a gun and was coming to his house.  (*Ibid.*)  After the defendant left in his vehicle, his estranged wife called the police.  (*Ibid.*)

An officer responded to the area where the victim lived, spotted what was later confirmed to be the defendant's vehicle parked on the street, and warned the victim, who was standing on his front porch, to get inside his house.  (*Morales*, *supra*, 5 Cal.App.4th at p. 921.)  After a second officer arrived, the defendant was found hiding in an alcove on the porch "behind a garbage can in 'kind of a catcher's crouch' with his hand in front of his groin."  (*Id.* at pp. 921–922.)  The defendant was approximately three or four feet away from where the victim had been standing on the porch and, from his location, he was able to see anyone leaving the house.  (*Id.* at p. 922.)  He had a gun inside his clothing on the underside of his upper arm, positioned to slide, barrel down, toward his hand when he dropped his arm.  (*Ibid.*)

Relying on *Miller*, addressed *ante*, the defendant challenged the sufficiency of the evidence supporting his conviction for attempted premeditated murder.  (*Morales*, *supra*, 5 Cal.App.4th at pp. 925–926.)  He claimed that, one, given his level of intoxication, "any intent to kill … was 'skewed'" and, two, "the evidence was insufficient as a matter of law to justify findings that [the] defendant committed the requisite 'direct but ineffectual act' towards killing [the victim], he had engaged in more than mere preparation, or that he would have committed a murder if the police had not found him." (*Id.* at p. 925.)

The appellate court distinguished *Miller*, which, as discussed, involved the presence of a third party constable during the alleged crime, and rejected the claim. (*Morales*, *supra*, 5 Cal.App.4th at p. 926.)  The court concluded that in light of the evidence that the defendant threatened to get the victim, subsequently pointed the gun at his estranged wife while threatening to get her and the victim, drove to the victim's

17.

house, and hid three or four feet from the door, there was sufficient evidence to support intent to kill, notwithstanding the defendant's intoxication. (*Ibid.*) The court further concluded that this evidence was sufficient to support the jury's finding that the defendant's action went beyond mere preparation. (*Id.* at pp. 926–927.)

Here, the People take the position that the facts of *Morales* are virtually indistinguishable from the facts in this case while defendant contends they are markedly different. We agree with the People that the facts in *Morales* are materially similar to those here, but "attempt jurisprudence calls for a pragmatic, case-specific approach …." (*Garton*, *supra*, 4 Cal.5th at p. 511.) Thus, *Morales* does not purport to establish a bright-line rule.

### a) Physical Distance

The crux of defendant's argument that *Morales* is inapt is his physical distance from the apartment while hiding in the car and his possession of a knife, in contrast with Morales's location three to four feet from the victim's door armed with a gun, which would have allowed Morales to kill the victim from a distance. Defendant places too much emphasis on these factors. First, although defendant was located by police hiding in his car in the parking lot, there is evidence that he spent some time lurking around the first floor grounds outside the apartment and on the second floor at the door and bedroom window of the apartment. That he was found in his car may well have been attributable to nothing more than the arrival of police. Even from his car, however, defendant was positioned to see if L.S. left the apartment, allowing him the opportunity to surprise and attack her. As such, we are not persuaded by defendant's attempt to distinguish *Morales* on the basis that police located Morales within feet of the victim's door versus in the backseat of a car parked some distance away, but with a direct sightline to the door.

We note that in *People v. Lopez*, this court recently addressed temporal proximity in the context of a substantial evidence challenge to an attempted robbery conviction. (*People v. Lopez* (2020) 46 Cal.App.5th 505, 514, review granted July 15, 2020, S261747

(*Lopez*).) Police, aware of a gang-related plan to commit home invasion robbery (*id.* at p. 510), interrupted the gang's plan by initiating a stop of a vehicle occupied by the defendant and four other men as they approached the targeted neighborhood (*id.* at p. 513). The defendant argued on appeal that he did not commit attempted robbery because he was not yet close enough to the targeted residences. (*Id.* at p. 516.)

The panel in *Lopez* rejected the argument, explaining that the vehicle was on course to reach the targeted residences within seconds to minutes and was only thwarted by virtue of police intervention. (*Lopez*, *supra*, 46 Cal.App.5th at p. 518, review granted.) The court concluded, "The particular facts and circumstances of this case 'would lead a reasonable person to "believe a crime [was] about to be consummated absent an intervening force"—and thus that "the attempt [was] underway"' when the police interceded." (*Id.* at pp. 518–519, quoting *Decker*, *supra*, 41 Cal.4th at p. 9.) We agree with the reasoning in *Lopez*, and reiterate that here, defendant was already on the premises of the targeted apartment before his plans, too, were interrupted by the arrival of police.[5]

---

[5] Defendant does not argue that the California Supreme Court's decision in *Garton* is factually analogous, but the decision bears mention because the parties address it on appeal and the *Lopez* court distinguished it in rendering its decision. In *Garton*, the court was tasked with determining whether the trial court had jurisdiction over a charge of conspiracy to commit murder in Oregon. (*Garton*, *supra*, 4 Cal.5th at p. 510.) Based on a jurisdictional rule that had been overruled prospectively and, therefore, still applied in the case, the court considered "whether [the defendant's] acts within California's borders independently constituted an attempt to commit murder [in Oregon]." (*Ibid.*)

The defendant in *Garton* planned the murder of his paramour's husband in detail, he planned to be personally involved in committing the murder, and he drove toward Oregon from California with a car full of weapons and other gear. (*Garton*, *supra*, 4 Cal.5th at p. 511.) However, the court concluded that the defendant's "actions in California did not occur in close proximity to the victim or to the anticipated site of the murder in the Portland area. While in California, [the defendant] could not 'enter[]' the murder scene [citation], 'hid[e] in a position that would give him a clear shot' [citation], or even 'go[] to the general vicinity' of the planned murder scene [citation]." (*Id.* at p. 512.) On each of these points, the facts in this case are materially different.

### b) Weapon Type

Nor are we persuaded that the distinction between the two types of weapons is of any significance. Defendant had a large butcher knife with him, along with duct tape capable of restraining L.S. and silencing her. We do not share defendant's view that these items, gathered together and transported in the middle of the night to the residence of an ex-partner with an order of protection against him, consist of nothing more than "innocent household" items. The jury was well entitled to infer that defendant's actions, coupled with his clear intent, went beyond mere preparation for the crime. Based on the foregoing, we find that defendant's conviction for attempted murder is supported by substantial evidence and the trial court did not err in denying his section 1118.1 motion for judgment of acquittal made at the close of the People's case-in-chief.

### 2. Premeditation Finding

Defendant also claims that even if we conclude his attempted murder conviction is supported by substantial evidence, the evidence is insufficient to support the jury's finding that he acted willfully, deliberately and with premeditation. Relying on his emotional state and professions of tiredness during his interrogation by Officer Glenn, he contends that "[his] mental state … precluded the 'careful thought' and 'weighing of considerations for and against the proposed actions' [citation] essential for a finding of premeditation and deliberation." Again, we disagree.

As a threshold matter, the prosecutor and defense counsel examined Officer Glenn about select statements defendant made during his interrogation on May 9, 2017, but some of the statements defendant cites in his argument, including that he lost both of his parents recently, he was tired, and it was "'too much'" were not among them. To the contrary, the jury heard that defendant was upset because he believed L.S. cheated on him during their entire relationship, that he admitted threatening to kill L.S. on May 1, 2017, and that the items in the bag were his and he brought them with him that night "to have a discussion with [L.S.]."

20.

In this case, there was ample evidence supporting each of the *Anderson* factors. (*Anderson*, *supra*, 70 Cal.2d at pp. 26–27.) Regarding motive, defendant and L.S. had been engaged to be married before breaking up and he was upset because he believed she was unfaithful during their relationship. Despite his awareness of a restraining order prohibiting him from contacting her, defendant called and texted L.S. repeatedly, sometimes in rapid succession, and he showed up at the apartment complex where she lived repeatedly, sometimes sleeping outside. L.S. testified that defendant's behavior escalated between January and May 2017, and he persisted in attempting to contact L.S. even while leading police on a high speed chase on May 1, 2017, telling her he was upset she called the police and that he did not care. The jury could reasonably infer from the evidence that defendant was obsessed with L.S., he was unwilling to accept the end of their relationship and his stalking behavior was escalating despite law enforcement involvement, evidencing a motive to kill in the face of her rejection.

With respect to planning and the nature of the attempted killing, as previously discussed, defendant drove to what he believed was still L.S.'s residence in the middle of the night with a bag of items described by Officer Glenn during trial as consistent with murder, he attempted to make contact with L.S., A.W. feared he was about to break in, and he lurked around the premises until police found him hiding in his car, which had a direct sightline to the apartment. Moreover, defendant admitted to Glenn that he had threatened to kill L.S. and he brought the items to L.S.'s apartment that night to "have a discussion with [her]." This evidence indicates a manner of attempted killing "'so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" ....'" (*People v. Brooks* (2017) 3 Cal.5th 1, 59, quoting *Anderson*, *supra*, 70 Cal.2d at pp. 26–27; accord, *People v. Halvorsen*, *supra*, 42 Cal.4th at pp. 419– 420.) Although defendant also told Glenn that he would never harm L.S., the jury was not required to accept that statement and disregard the other evidence. In sum, the jury's

21.

finding that defendant acted willfully, deliberately and with premeditation is supported by substantial evidence and we reject his contrary argument.

## II. Instructional Error

### A. Procedural Background

Defendant was charged in counts 4 and 5 with violating a protective order under section 166, subdivision (c)(4). The parties agree, as do we, that the trial court erred when it instructed the jury on these counts. Relevant to defendant's claim, subdivision (c)(1)(A) of section 166 provides: "Notwithstanding paragraph (4) of subdivision (a), a willful and knowing violation of a protective order or stay-away court order described as follows shall constitute contempt of court, a misdemeanor, punishable by imprisonment in a county jail for not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both that imprisonment and fine: [¶] … An order issued pursuant to Section 136.2."[6] Subdivision (c)(4) of section 166, at issue here, provides: "A second or subsequent conviction for a violation of an order described in paragraph (1) occurring within seven years of a prior conviction for a violation of any of those orders and involving an act of violence or 'a credible threat' of violence, as provided in subdivision (c) of Section 139, is punishable by imprisonment in a county jail not to exceed one year, or in the state prison for 16 months or two or three years."

The trial court instructed the jury pursuant to CALCRIM No. 2701, the pattern instruction for violating a protective order or stay-away order under subdivision (c)(1) of section 166, as follows:

---

[6] Section 166, subdivision (a)(4), provides: "Except as provided in subdivisions (b), (c), and (d), a person guilty of … the following contempt[] of court is guilty of a misdemeanor: [¶] … [¶] … Willful disobedience of the terms as written of any process or court order or out-of-state court order, lawfully issued by a court, including orders pending trial."

22.

"The defendant is charged in Counts 4 and 5 with violating a court order, in violation of Penal Code Section 166[, subdivision ](c)(4). [¶] To prove that the defendant is guilty of this crime, the People must prove that:

"One, a court lawfully issued a written order that the defendant have no contact with [L.S.];

"Two, the court order was a protective order issued in a post-criminal proceeding involving domestic violence;

"Three, the defendant knew of the court order;

"Four, the defendant had the ability to follow the court order;

"And five, the defendant willfully violated the court order.

"Someone commits an act willfully when he or she does it willingly or on purpose.

"'Domestic violence' means abuse committed against an adult who is a person who dated or is dating the defendant.

"'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else."

However, the court failed to instruct the jury that it had to find conduct involving an act of violence or a credible threat of violence, pursuant to CALCRIM No. 2703, the pattern instruction applicable to subdivision (c)(4) of section 166. The court also failed to instruct the jury that it had to find whether the violation occurred within seven years of a prior conviction for violating a protective or stay-away order. (CALCRIM Nos. 3100–3103.)

**B.    Standard of Review**

"A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 326.) Relevant to the claim raised in this case, "[t]he trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824; accord, *People v. Mil* (2012) 53 Cal.4th 400, 409.) When the trial court fails to instruct

23.

the jury on an element of the offense, the error is of federal constitutional magnitude "because it violates the defendant's due process and Sixth Amendment rights to have a jury adjudicate guilt beyond a reasonable doubt." (*People v. Banks* (2014) 59 Cal.4th 1113, 1153, abrogated on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; accord, *People v. Merritt*, *supra*, at p. 824; see *Alleyne v. United States* (2013) 570 U.S. 99, 103 (plurality opinion) ["Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."].) "[T]he more elements that are omitted, the less likely it is that the error is harmless, but so long as the error does not vitiate *all* of the jury's findings, it is amenable to harmless error analysis." (*People v. Merritt*, *supra*, at p. 829; accord, *People v. Mil*, *supra*, at pp. 413–414.) Under the test set forth in *Chapman*, "[s]uch error is 'harmless only if, after conducting a thorough review of the record, the court determines beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" (*People v. Banks*, *supra*, at p. 1153; accord, *People v. Merritt*, *supra*, at p. 831.)

### C.     Analysis

#### 1.     Technical Error in Verdict Form

As previously stated, the People agree with defendant that under section 166, subdivision (c)(4), the trial court erred when it failed to instruct the jury it had to determine whether defendant suffered a prior qualifying conviction and whether his conduct involved an act of violence or a credible threat of violence. However, defendant also argues that he is entitled to reversal because the jury returned verdicts convicting him of violating section 136.2. The People do not concede this irregularity with the verdict forms on counts 4 and 5 rises to the level of reversible error and we agree.

"[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." (*People v. Webster* (1991) 54 Cal.3d 411, 447; accord, *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272.) It is clear that the jury

24.

intended to convict defendant of felony violation of a protective order, as charged, and the reference to section 136.2, which governs types of orders a court may issue to protect a victim or witness, was an inadvertent technical error.[7]  This error, therefore, does not provide a ground for reversal on counts 4 and 5.

### 2.    Instructional Error Prejudicial

Turning to the trial court's instructional error, although the parties do not engage in a separate analysis of the issue, we must determine whether the error was prejudicial. (*People v. Merritt, supra*, 2 Cal.5th at p. 829.)  We first consider conduct involving an act of violence or a credible threat of violence, as that result is mixed.  This case did not involve an act of violence, but the jury heard evidence that defendant threatened to kill L.S. on May 1, 2017, and the jury convicted defendant of stalking L.S. and making criminal threats against her on that date.[8]

The term "credible threat" within the meaning of section 166, subdivision (c)(4), is defined by section 139, subdivision (c), which provides, "As used in this section, 'a

---

[7]    The information alleges that defendant "did willfully and unlawfully commit contempt of court by knowingly violating a protective order or stay away court order issued pursuant to section 136.2, in a pending criminal proceeding involving domestic violence, to wit:  in Kern County Superior Court case number BM898109A, as defined in section 13700, or issued as a condition of probation after a conviction in a criminal proceeding involving domestic violence, as defined in section 13700, or that is an order described in [section] 166[, subdivision ](c)(3) having been previously convicted of a violation of Penal Code section 166[, subdivision ](c)(1) within seven (7) years and said contempt involving an act of violence or 'a credible threat' of violence, as provided in subdivision (c) and (d) of section 139, in violation of Penal Code section 166[, subdivision ](c)(4), a felony."  (Full capitalization omitted.)

[8]    Section 646.9, subdivision (a), which proscribes stalking, provides, "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking …."  The jury found defendant violated subdivision (b) of section 646.9, which provides greater punishment for "[a]ny person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party…."

25.

credible threat' is a threat made with the intent and the apparent ability to carry out the threat so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family." Stalking includes making a credible threat as an element (*People v. Itehua* (2014) 227 Cal.App.4th 356, 360; accord, *People v. Ewing* (1999) 76 Cal.App.4th 199, 210), and making criminal threats includes threatening to commit a crime involving death or great bodily injury as an element (*People v. Fruits* (2016) 247 Cal.App.4th 188, 203–204, fn. 8, citing *People v. Toledo* (2001) 26 Cal.4th 221, 227–228). Count 4 relates to violation of a protective order on May 1, 2017, and, as to that count, by way of also convicting defendant of stalking and making criminal threats on May 1, 2017, the jury made "essential findings" that render the trial court's failure to instruct the jury it had to find a credible threat of violence harmless beyond a reasonable doubt.[9] (*People v. Mil*, *supra*, 53 Cal.4th at p. 416.) In this case, "[no] rational fact finder could have come to the *opposite* conclusion." (*Id.* at p. 418.) However, count 5 relates to violation of a protective order on May 9, 2017, and the prosecutor presented no evidence that defendant committed an act of violence or made a credible threat of violence against L.S. on that date. Therefore, the failure to instruct on this element is not harmless as to count 5.

---

Section 422, which proscribes making criminal threats, is violated when a defendant "willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety…." (§ 422, subd. (a).)

[9] In contrast with violation of a protective order under section 166, subdivision (c)(4), neither stalking under section 646.9 nor making criminal threats under section 422 requires proof that the defendant actually intended to carry out the threat, but on the facts of this case, that distinction does not affect the outcome of the prejudice analysis. (§§ 139, subd. (c), 646.9, subd. (g), 422, subd. (a).)

Turning to the prior conviction element, the probation report reflects that in 2012, defendant was charged with violating section 166, subdivision (c)(1), and sentenced to a jail term. However, the prosecutor did not present any evidence of this prior conviction. Therefore, the trial court's failure to instruct on this issue may not be deemed harmless.

### 3. Reduction of Felony Convictions to Misdemeanors

This leaves the remedy. In his opening brief, defendant requests reversal in light of the trial court's instructional error. Citing to section 1181, subdivision 6, and section 1260, the People contend that we may modify the verdicts on counts 4 and 5 from the greater offenses under subdivision (c)(4) of section 166 to the lesser included offenses under subdivision (c)(1) of section 166.[10] In reply, defendant requests either reversal or reduction to misdemeanors.

As the California Supreme Court has explained, "[u]nder section 1181, subdivision 6, a jury verdict not supported by the evidence may be modified if the record establishes the defendant's guilt of a lesser included offense. The requirement that the lesser offense be included in the greater 'is based upon due process considerations: A criminal defendant must be given fair notice of the charges against him in order that he may have a reasonable opportunity properly to prepare a defense and avoid unfair

---

[10] Section 1181, subdivision 6, provides, "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial … [¶] … [¶] … [w]hen the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed[.]"

Section 1260 provides, "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

surprise at trial.' [Citation.] The requirement also preserves the jury's role as the finder of fact. The modification permitted by section 1181, subdivision 6 'merely brings the jury's verdict in line with the evidence presented at trial.' [Citation.] The reviewing court corrects the verdict '"not by finding or changing any fact, but by applying the established law to the existing facts *as found by the jury*."'" (*People v. Robinson* (2016) 63 Cal.4th 200, 206–207, fn. omitted.)

"To ascertain whether one crime is necessarily included in another, courts may look either to the accusatory pleading or the statutory elements of the crimes. When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense. [Citations.] 'The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater. [Citation.] In other words, "'[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.'"'" (*People v. Robinson, supra*, 63 Cal.4th at p. 207, fn. omitted.)

Our high court has drawn distinctions between substantive offenses, enhancements, and penalty provisions (e.g., *People v. Brookfield* (2009) 47 Cal.4th 583; *People v. Anderson* (2009) 47 Cal.4th 92, 101; *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 898–899; *People v. Acosta* (2002) 29 Cal.4th 105, 118–119), while "also recogniz[ing] that the distinction is not always relevant[]" (*People v. Cross* (2015) 61 Cal.4th 164, 178). In this case, there is no dispute that the trial court properly instructed the jury on the elements of violating a protective order under subdivision (c)(1) of section 166, which is a misdemeanor offense, or that the jury's findings in this regard are supported by sufficient evidence. However, violation of subdivision (c)(4) of section 166, which is a wobbler offense and under which defendant was charged with and sentenced for a felony, requires proof of an additional two facts: a prior qualifying

conviction within seven years and conduct involving an act of violence or a credible threat of violence. The parties agree that in this case, we may modify the verdict on counts 4 and 5 to reflect misdemeanor convictions for violating section 166, subdivision (c)(1).

The Court of Appeal considered a similar situation in *People v. Torres* (2011) 198 Cal.App.4th 1131 (*Torres*) and we find that decision instructive. In *Torres*, the court considered the defendant's conviction for dissuading a witness in violation of section 136.1 (*id.* at p. 1134), which the court described as "defin[ing] a family of 20 related offenses[; t]here are five underlying offenses that are wobblers alternately punishable as misdemeanors or felonies" (*id.* at p. 1137, fn. omitted). Subdivision (a) of section 136.1 provides that preventing or dissuading a witness, or attempting to prevent or dissuade a witness, "from attending or giving testimony at any trial, proceeding, or inquiry authorized by law[]" is punishable as a misdemeanor or a felony.[11]

---

[11] Section 136.1 provides in full:

"(a) Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:

"(1) Knowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.

"(2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.

"(3) For purposes of this section, evidence that the defendant was a family member who interceded in an effort to protect the witness or victim shall create a presumption that the act was without malice.

"(b) Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:

Subdivision (b) of section 136.1, also punishable as a misdemeanor or a felony, more specifically pertains to attempting to prevent or dissuade a crime victim or witness to a crime under certain enumerated circumstances.  Finally, subdivision (c) of section 136.1, which is a felony punishable by two, three, or four years in state prison, applies to those who violate either subdivision (a) or subdivision (b) under specified circumstances.

---

"(1)     Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge.

"(2)     Causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof.

"(3)     Arresting or causing or seeking the arrest of any person in connection with that victimization.

"(c)     Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances:

"(1)     Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person.

"(2)     Where the act is in furtherance of a conspiracy.

"(3)     Where the act is committed by any person who has been convicted of any violation of this section, any predecessor law hereto or any federal statute or statute of any other state which, if the act prosecuted was committed in this state, would be a violation of this section.

"(4)     Where the act is committed by any person for pecuniary gain or for any other consideration acting upon the request of any other person. All parties to such a transaction are guilty of a felony.

"(d)     Every person attempting the commission of any act described in subdivisions (a), (b), and (c) is guilty of the offense attempted without regard to success or failure of the attempt. The fact that no person was injured physically, or in fact intimidated, shall be no defense against any prosecution under this section.

"(e)     Nothing in this section precludes the imposition of an enhancement for great bodily injury where the injury inflicted is significant or substantial.

"(f)     The use of force during the commission of any offense described in subdivision (c) shall be considered a circumstance in aggravation of the crime in imposing a term of imprisonment under subdivision (b) of Section 1170."

30.

The jury in *Torres* convicted the defendant of violating section 136.1, as previously stated, and the trial court sentenced him to the upper term under subdivision (c)(1) of section 136.1. (*Torres*, *supra*, 198 Cal.App.4th at pp. 1134–1135.) However, the jury was instructed on subdivision (b)(1) of section 136.1, but not on finding "the existence of any of the subdivision (c) circumstances that would make the crime a straight felony." (*Torres*, *supra*, at p. 1142.) The court stated, "Subdivision (c)(1) must be recognized as describing a greater offense with its own alternative and separate sentencing scheme." (*Id.* at p. 1147.) Concluding "[i]t is elementary that a defendant should not be punished for a crime of which he was not convicted" (*id.* at p. 1148), the court accepted the parties' concession that modification of the verdict to reflect conviction under subdivision (b)(1) of section 136.1 was the appropriate remedy (*Torres*, *supra*, at p. 1149). An error of the same type occurred here and we note that section 136.1 and section 166 are materially similar in structure. As in *Torres*, the parties concede that modification of the verdicts is appropriate to reflect the jury's finding that defendant violated section 166, subdivision (c)(1), and we accept that concession. (*Torres*, *supra*, at p. 1149.)

**III.    Error in Abstract of Judgment**

Finally, we have the authority to correct clerical errors on our own motion. (§ 1260; *People v. Mitchell* (2001) 26 Cal.4th 181, 185; *In re Candelario* (1970) 3 Cal.3d 702, 705; *People v. Amaya* (2015) 239 Cal.App.4th 379, 385.) The abstract of judgment in this case incorrectly reflects that defendant's one-year sentence on count 2 is the upper term and a full, consecutive term rather than one-third of the middle term. The trial court shall, in the course of issuing an amended abstract of judgment following resentencing on counts 4 and 5, correct this clerical error to reflect that defendant's one-year sentence on count 2 is one-third of the middle term.

## DISPOSITION

On counts 4 and 5, defendant's felony convictions for violating a protective order under subdivision (c)(4) of section 166 are modified to reflect misdemeanor convictions for violating a protective order under subdivision (c)(1) of section 166, and the matter is remanded for resentencing. Following resentencing, the trial court shall issue and forward to the appropriate authorities an amended abstract of judgment reflecting, one, the modification to counts 4 and 5 and, two, that the one-year sentence on count 2 is one-third of the middle term. Except as modified, the judgment is affirmed.

MEEHAN, Acting P.J.

WE CONCUR:

SNAUFFER, J.

DE SANTOS, J.