[No. A051119. First Dist., Div. Three. Apr. 23, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERTO GUILLERMO MORALES, Defendant and Appellant.

918

**COUNSEL**

Renee L. Berenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Gloria Folger Dehart, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

WHITE, P. J.—Roberto Guillermo Morales appeals from a judgment of conviction based upon a jury finding him guilty of attempted deliberate and premeditated murder. (Pen. Code, §§ 664, 187.)[1]

### FACTS

With the exception of the degree of defendant's intoxication on January 1, 1990, there is relatively little controversy on the facts in this case. Although defendant lived in the same house as his wife, Clara, and their nine-year-old daughter, Desiree, the marriage was in trouble. Defendant drank during the entire marriage, and the drinking became worse in 1989. The couple did not sleep together, did not go out together and barely spoke. Clara had filed a petition for dissolution of the marriage in September 1989. On December 13, 1989, the court ordered defendant to leave the house on January 6, 1990.

Clara started seeing John Falkowski in August 1989. John had two daughters, Brandy and Amber. On Christmas Day, Clara, John, Desiree and Brandy went to visit friends. Later that day, John dropped Clara and the children at Clara's house. He left driving Clara's car, a BMW that had been driven by defendant during the marriage and of which defendant was particularly fond. On the day following Christmas, defendant came home from work at 7 a.m. He was upset that the BMW was missing.

Clara telephoned John and told him defendant was upset John had the car. She advised him not to come to the house; she and Brandy would meet him at the corner. Clara and Brandy started walking down the block to the corner; defendant followed in his car. When John arrived, Clara and Brandy got in quickly. Clara told John that defendant was following her and she thought he had a gun.

Clara did not see defendant again until New Year's Day. He was at the home of his parents when Clara went to pick up Desiree, who had spent the night. Desiree was out with defendant's sister when she arrived, and Clara waited about three hours for Desiree to return. While waiting for Desiree, Clara observed defendant drinking "cows," an alcoholic eggnog drink, wine and vodka. She thought defendant was drinking to "bug" her. When Desiree returned, Clara met her outside the house; she did not like Desiree seeing defendant when he was drinking. Clara and Desiree returned to their home about 1 p.m.

Defendant telephoned the house around 5 p.m. When Clara answered the phone, defendant said, "Put Desiree on the phone, bitch." Clara hung up.

---

[1] All further statutory references are to the Penal Code.

Defendant immediately called back, said the same thing and Clara again hung up. The third time defendant phoned, Desiree answered and Clara could hear her say, "Papa, I don't want you coming home if you are drinking." Defendant called again and Clara answered. Defendant stated, "I'm going to get your fuckin' faggot boyfriend. He lives on Easton and Angus, doesn't he?" Clara responded, "Robert, don't be stupid. You have been drinking. I am going to call the police." After the conversation ended, Clara attempted to call John who was not home; she told his brother to have him call her as soon as he returned.

Defendant came home shortly thereafter. At the same time the telephone rang. As Clara was speaking to John on the phone, she could see defendant loading a gun. Clara told John, "John, call the police. Robert's loading a gun. He is coming to your house." John told Clara to call the police. Clara agreed and hung up. Defendant then walked up to Clara, pointed the gun to her face, cocked the gun and said, "I am going—I am going to go get your boyfriend. Then I am going to come back for you." Defendant left the house and got into his car. Clara immediately called the police, explained the situation and gave a description of defendant's automobile.

Thomas Daniels and Craig Morton, both San Bruno police officers, received a dispatch from the station about 6:30 p.m. on January 1, stating that a lady had called saying that her husband was going to San Bruno to kill her boyfriend. As Morton drove down Angus Avenue, he spotted a gray Volkswagen Rabbit with right front damage, which fit the description of the vehicle in the dispatch. The car was parked on the north side of Angus Avenue, just west of Easton. Morton radioed the license number to the dispatcher. He then proceeded to drive north on Easton Avenue, in order to look for defendant and to check on John Falkowski's welfare. As he drove past his house, he saw Falkowski standing on the front porch. Morton asked if Falkowski was aware defendant was coming to get him and advised him to get inside the house. After learning from the dispatcher the gray Volkswagen belonged to defendant, Morton returned to the vehicle.

Officer Daniels arrived a short while later. Morton and Daniels returned to Falkowski's house and advised him they had located defendant's car, there was a holster in the vehicle, and if he intended to leave, he should do so then. Falkowski thanked the officers for their concern and went into the house. Morton then checked the north side of the house and Daniels went to check the south side.

Daniels found defendant on the south side of the porch, underneath the porch overhang. He was standing in a little alcove behind a garbage can in

"kind of a catcher's crouch" with his hand in front of his groin. Defendant was approximately three or four feet from the front steps where Falkowski had been standing. He would be able to see anybody leaving the house from this position. Daniels pulled his gun and ordered defendant not to move. He then told defendant to raise his hands, stand up and come out. Defendant followed the instructions.

Assisted by Officer Morton who had come to the scene, Daniels grabbed defendant. When grabbing defendant's arm, Daniels felt a pistol. Daniels warned Morton and the officers pushed defendant to the ground. Daniels asked defendant if the gun was loaded and received an affirmative response. When asked whether the gun was cocked, defendant said no. Daniels retrieved defendant's gun which was underneath defendant's upper arm, inside the sleeve of both his jacket and sweatshirt, with the pistol barrel pointing down towards the elbow. It was in a position to slide down towards defendant's hand when he dropped his arm.

Officer Daniels, who had been a bartender for four years and a police officer for fifteen years, testified he noticed no odor of alcohol on defendant's breath. Defendant's speech was not slurred and he had no difficulty either standing or walking. Daniels observed no objective symptoms that would lead him to believe defendant was under the influence of alcohol. Although Daniels was informed that Clara had said defendant had been drinking heavily that day, he did not order a blood-alcohol test. Daniels admitted that in writing the police report about the incident, he had stated defendant was slow in following several commands.

The thrust of the defense was that defendant was intoxicated on New Year's Day and did not know what he was doing. Toni Munoz, a coworker of defendant at the post office, testified that she had had a close personal relationship with defendant for two and one-half years, ending in March of 1989. During their relationship defendant drank every day. She frequently saw him intoxicated, but it was difficult to precisely say how often, since he was not sloppy and did not stagger. However, there were at least two occasions when defendant experienced blackouts and could not remember what had occurred when he had been drinking. Sometimes defendant would drink moderately, and other times he would "O.D." The difference was not always discernible, because he was a good-natured guy who did not get belligerent. Toni was never concerned about defendant driving a car when he had been drinking; he was able to operate a vehicle safely after drinking a large amount of alcohol. Towards the end of the relationship, defendant's drinking increased. Toni terminated the relationship, because defendant started acting unpredictably.

Monica Gibson, another coworker, became a close friend of defendant. She stated he drank frequently and constantly; he was always drinking and under the influence of alcohol most times. On New Year's Eve, defendant and Monica worked at the post office. They began their shift at 10:30 p.m. and worked until 4 or 5 a.m. Defendant was drinking at work. After finishing work, defendant and Monica stopped at a 7-Eleven store, purchased two quarts of Cisco, a cheap liquor, and two 6-packs of beer. Then they went to Monica's house and drank all the liquor they had purchased plus Tanqueray gin that Monica kept at her house. They drank, without eating and with little sleep, until noon. Monica opined defendant was intoxicated; although he was not staggering, he had been intoxicated before they arrived home and he was "not there mentally."

Defendant testified he drank throughout his marriage and his drinking had progressively increased. During 1989, he would drink during working hours and was still able to function at his job.

Defendant was served with dissolution documents in October 1989. When he went to court on December 13, he was ordered to leave the house. Defendant started packing his belongings and looking for an apartment. He was aware that Clara was seeing John Falkowski at that time.

Defendant worked at the post office on Christmas Eve and Christmas Day of 1989. When he came home from work the day after Christmas, he thought it was unusual the BMW was not there. When he entered the house, Desiree told him she had a friend staying overnight. Desiree introduced Brandy to defendant, and he realized it was John's daughter. When Clara discovered defendant was home, she left the house with Brandy and said she would be back in five minutes. Defendant went outside the house to see where Clara was going. He then got into his car to follow them. As he was following Clara, he saw the BMW driven by a man. Defendant was not angry and just returned home.

During the week between Christmas and New Year's, defendant was drinking a lot. He would drink both at work and after work. He was sad about not being able to stay in the same house as his daughter and was angry at himself. On New Year's Eve, he went to work at the normal time. He had a couple of drinks of hard liquor and a six-pack of beer on the job. The alcohol made him feel happy. After work, he and Monica purchased some alcohol and went to her house. He drank some more at Monica's house, felt drunk, took a nap and left at 10:30 or 11 a.m. to go to his mother's house.

At his mother's house, defendant drank beer, watched television and talked to his family. He had three or four beers, about three "cows," and

about three double shots of vodka. He also drank about half a 1.5 liter bottle of white wine. He was feeling pretty drunk. When Clara came to pick Desiree up, he did not speak with her; Clara was in the kitchen with defendant's mother and defendant was in the living room. When Clara left with Desiree, he looked out the window to say goodbye to Desiree. He was not angry with Clara or her boyfriend John.

An hour after Clara left, defendant drove his nephew to a park to play football. He remained at the park, drinking three or four beers, until dark. Defendant drove his nephew back to his mother's house. He was feeling happy and drunk.

Defendant tried to telephone Desiree. The first two times he called, Clara hung up. Desiree answered the phone the third time he called. Desiree said she had to get off the phone; she also told him he should not be drinking so much. Defendant could not recall making any statements about going to Angus and Easton Avenues. About a week prior to this, he had found a piece of paper with the street names Angus and Easton on Clara's night table, but they had not meant anything to him. When defendant hung up, he felt neglected and drunk, but not angry.

When defendant went home, he went to the bedroom and could just remember staring at his wife. When leaving the house, gun in hand, he told her, "I'm going to go get that faggot boyfriend of yours. Then I'm going to come back and get you." He did not remember getting the gun. When he left the house, he had no bad intentions.

Defendant remembered getting into his car. The next thing he remembered was getting out of the car. He did not know where he was. Defendant intended to go to the intersection of Angus and Easton "in a way"; he wanted to frighten his wife. After he parked the car, defendant started walking down the street. He did not remember having a gun; it was not until it started to get cold and he put his hands in his jacket that he felt the gun.

Defendant did not know where he was going. He thought he was in San Francisco, because he saw a lot of Victorian houses. He then got scared, because he knew he had the gun. He started looking for a place to hide, saw a stairwell and ran underneath it. He dozed off to sober up so he could find his car. Defendant did not know he was at John Falkowski's house; it was a terrible coincidence. He never intended to kill anybody.

Ann Kolod, the charge nurse at the main San Mateo County jail, testified as a rebuttal witness. She stated when individuals who are considered

alcoholics are taken into custody, they are interviewed and given vitamins or medication to prevent alcohol withdrawal. Defendant's records indicated he was not treated for any symptoms of alcohol withdrawal.

Dr. Mary Anne Edwards, a certified expert in addiction medicine, was called as another rebuttal witness. She stated that a person experiencing a blackout appears to be functioning normally, but does not remember what happened the next day. Nonetheless, that person is able to appreciate what is happening when the blackout is occurring.

## DISCUSSION

### Sufficiency of the Evidence

Defendant contends there was insufficient evidence to find him guilty of attempted murder. He maintains any intent to kill John Falkowski was "skewed" by the massive amount of alcohol consumed that day. He also asserts the evidence was insufficient as a matter of law to justify findings that defendant committed the requisite "direct but ineffectual act" towards killing Falkowski, he had engaged in more than mere preparation, or that he would have committed a murder if the police had not found him.

The standard of review governing judicial review of a criminal conviction is settled. The appellate court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *People* v. *Rippberger* (1991) 231 Cal.App.3d 1667, 1680 [283 Cal.Rptr. 111].)

In order to prove a defendant committed an attempted murder, there must be sufficient evidence of the intent to commit the murder plus a direct but ineffectual act towards its commission. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 452 [194 Cal.Rptr. 390, 668 P.2d 697].) "Preparation alone is not enough, there must be some appreciable fragment of the crime committed[] [and] it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, . . ." (*People* v. *Buffum* (1953) 40 Cal.2d 709, 718 [256 P.2d 317].)

Defendant concedes a defendant's statement of intention to kill a person has been found sufficient to prove intent to kill in the context of

attempted murder. However, citing *People* v. *Miller* (1935) 2 Cal.2d 527 [42 P.2d 308, 98 A.L.R. 913], he maintains that such a statement does not always suffice.

In *Miller*, the defendant, somewhat intoxicated, threatened to kill the victim for annoying his wife. He then went to the field owned by the town's constable, where the victim worked. The defendant walked in the direction of both the constable and victim and loaded his rifle. The victim fled. The defendant then continued in the direction of the constable, who took the gun. On these facts, our Supreme Court found insufficient evidence of attempted murder. The court reasoned: " '[B]etween preparation and execution there is a gap which criminal jurisprudence cannot fill up so as to make one continuous offense. There may be a change of purpose, or the preparation may be a vague precautionary measure, to which the law cannot append a positive criminal intent, ready to ripen into guilty act.' " (*People* v. *Miller*, *supra*, 2 Cal.2d at p. 530, quoting Wharton's Criminal Law, 12th ed., vol. 1, p. 292.) The court concluded that, "no one could say with certainty whether the defendant had come into the field to carry out his threat to kill [the victim] or merely to demand his arrest by the constable." (*Miller*, *supra*, 2 Cal.2d at p. 532.)

The facts in the case at bench are not as equivocal as those in *Miller*. At approximately 5 p.m., defendant called his home and told Clara he was going to get her boyfriend. A short time later, defendant came home, went to his bedroom and loaded his gun. As he left the house, defendant pointed the gun at Clara, and again announced he was going to get John, then come back for her. Defendant apparently drove directly to Easton and Angus Avenues, parked his car and went to John Falkowski's house. He was discovered crouched near a garbage pail, three or four feet from the exit of Falkowski's house. Unlike the facts in *Miller*, there was no other person in the vicinity who might provide an alternative explanation for defendant's presence. Even if the defense theory that defendant was operating in an alcoholic blackout was true, the jury was free to believe Dr. Edwards's testimony that defendant still could appreciate what was happening.

Defendant also claims his conduct did not pass beyond mere preparation. He submits there was no evidence he had accomplished some "appreciable fragment" of the crime. We disagree. Our Supreme Court has acknowledged that where the design of the accused is clearly shown, slight acts done in furtherance of the crime will constitute an attempt (*People* v. *Miller*, *supra*, 2 Cal.2d at p. 531); it is not necessary that the overt act be the last possible step prior to the commission of the crime. (*People* v. *Dillon*, *supra*, 34 Cal.3d at p. 453.) As stated above, defendant not only threatened to get Falkowski

twice, he went home, loaded his gun, drove to his victim's neighborhood, and finally hid in a position that would give him a clear shot at Falkowski if Falkowski left by the front door.

## Attempted Voluntary Manslaughter

The jury was instructed both on attempted first degree murder and attempted second degree murder. It was not instructed on attempted voluntary manslaughter. ■ Defendant contends the court had a sua sponte duty to instruct on attempted voluntary manslaughter because of his intoxication. The contention lacks merit.

The California Supreme Court recently held that the trial court does not have a sua sponte duty to instruct the jury on the effect of voluntary intoxication and specific mental states. Rather, the obligation is on the defense to request a "pinpoint" instruction which ties the evidence of the defendant's intoxication to the disputed element of the crime. (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588].) "This is so because the defendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such a case the defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him [citation], but such a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Ibid.*)

Accordingly, assuming for purposes of argument there was sufficient evidence of intoxication to support an instruction on the absence of intent to kill due to voluntary intoxication, the obligation was on defendant to request it. While defendant requested instructions on voluntary manslaughter related to sudden quarrel, heat of passion, and honest but unreasonable belief in the right to defend, those instructions did not incorporate the legal theory of an absence of malice due to intoxication. The trial court did not err in failing to instruct on this theory sua sponte.

## Holsters and Handcuffs

Defendant objected to the admission of all items found in the search of his vehicle at the scene of the crime. The prosecutor argued that gun holsters, handcuffs, mace and ammunition were relevant to the issue of deliberation, premeditation, intent, planning and purpose. The court admitted evidence of

the weapons and certain photographs. While defendant concedes evidence of gun holsters and handcuffs was material to a charge of premeditated attempted murder, he asserts the evidence was more prejudicial than probative. He maintains the presence of gun holsters in his car gave the impression he had a greater-than-average interest in guns; the presence of handcuffs lent a threatening and evil image.

Defendant's argument concerning prejudice is too speculative to take seriously. The fact that defendant left the holster and handcuffs in his car can just as easily support his claim of lack of premeditation and deliberation. Indeed, defendant presents this argument in his appellate brief. Thus, we find no prejudice.

*Prosecutorial Misconduct*

During closing argument the prosecutor asked the jury to consider the reactions of those closest to them in reaching a verdict. In discussing defendant's stated intent, he argued: "If you have any doubt about how powerful a piece of information that is, remember tonight, or tomorrow, whenever you finish deciding this case, eventually you are going to be able to discuss this case with your spouses or your significant others and imagine when you tell them you had a case where the defendant admitted his intent to kill, he told one of his intended victims, I am going to go and get the faggot boyfriend and then I am coming back for you—if you are thinking about letting him escape with responsibility for that, think about what your spouse or significant others are going to say. [¶] They are going to say, he admitted and you let him go? [¶] That guy, who admitted intent to kill and did everything necessary to carry out that plan till the cops got there, who was five feet from his victim, is back out on the street. [¶] What were you thinking of? [¶] That's what the reaction is going to be." Defendant contends the prosecutor's statements constituted prejudicial misconduct in that he asked the jury to base its verdict on considerations outside the merits of the case.

█ It is, of course, misconduct for a prosecutor to suggest that jurors disregard instructions and consider public opinion in determining the guilt phase of a criminal trial. (CALJIC No. 1.00 (5th ed. 1988).) Although defendant acknowledges no timely objection was made at trial, he asserts an objection was not waived since 1) this was a closely balanced case where the misconduct contributed to the verdict, and 2) a timely objection and admonition would not have cured the error. (See *People* v. *Green* (1980) 27 Cal.3d 1, 28 [164 Cal.Rptr. 1, 609 P.2d 468].) We reject both views. This was not a particularly close case; nor were counsel's remarks so egregious they could not have been cured by an admonition by the court.

■ Finally, defendant argues his counsel was incompetent for failing to object. In fact, during closing argument, defense counsel stated: "Robert Morales did something that was—that was extremely stupid, but he did not go to the lengths that the prosecution has charged him. [¶] He did not attempt to commit a murder. And their case has fallen short of the required burden of proof. [¶] And you are not to feel somehow that you are—you would not be able to face your wives or husbands because you voted for an acquittal in this case. [¶] You have to vote what's in your conscience. You have to vote what you think is correct and right, without being prejudiced against the defendant or prejudiced for either side." We cannot fault counsel for electing to respond to the prosecutor's argument rather than making an objection.

### Separate Sentence for Concealed Firearm

The court sentenced defendant to life with possibility of parole plus a one-year consecutive sentence for being armed with a firearm. (§ 12022, subd. (a).) In addition, the court imposed a six-month concurrent sentence for possession of a concealed firearm. (§ 12025.) Defendant contends, and the People concede, such a sentence was barred by the provisions of section 654. Accordingly, the six-month sentence should be stayed.

### Cruel and Unusual Punishment

■ Pursuant to section 664,[2] defendant was sentenced to life in prison with the possibility of parole. Citing *People* v. *Dillon, supra*, 34 Cal.3d at p. 478 and *In re Lynch* (1972) 8 Cal.3d 410, 423-424 [105 Cal.Rptr. 217, 503 P.2d 921], defendant contends a life sentence in this case constitutes cruel

---

[2]Section 664 provides in pertinent part: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable, where no provision is made by law for the punishment of such attempts, as follows: [¶] 1. If the offense so attempted is punishable by imprisonment in the state prison, the person guilty of such attempt is punishable by imprisonment in the state prison for one-half the term of imprisonment prescribed upon a conviction of the offense so attempted; provided, however, that if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punishable by imprisonment in the state prison for life with the possibility of parole; provided, further, that if the crime attempted is any other one in which the maximum sentence is life imprisonment or death the person guilty of the attempt shall be punishable by imprisonment in the state prison for a term of five, seven, or nine years. The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact."

and unusual punishment in that it is grossly disproportionate to the offense for which it is imposed.[3]

The "techniques" to aid in determining proportionality call first for an examination of "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*In re Lynch, supra,* 8 Cal.3d at p. 425.) "In conducting this inquiry, however, the courts are to consider not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.)

The Legislature has determined that if the attempted murder is willful, deliberate and premeditated, the offense is sufficiently serious to justify a life sentence. There is nothing in the particular facts of this case to warrant a lesser sentence. Defendant threatened to kill Falkowski and then return to kill Clara. He loaded his gun, drove to Falkowski's home and was found crouching near the front door. The fact that Falkowski was neither injured nor traumatized does not lessen the seriousness of the offense. A jury found defendant had the mental state that triggers imposition of a life sentence.

Defendant also complains that while convictions for aggravated mayhem, torture, kidnapping for financial gain, and intentionally derailing a train without causing death carry life sentences, attempts for these offenses carry a statutory maximum sentence of nine years. (§ 664.) The simple answer is that the Legislature has determined that the willful, deliberate and premeditated attempt specifically to take life is a more serious offense than an attempt to commit the enumerated offenses. We do not disagree with this determination and find it neither cruel nor unusual punishment.

Finally, defendant compares his sentence with a possible 25 years to life sentence for first degree murder. (§ 190, subd. (a).) Although he acknowledges he is eligible for parole before a prisoner serving a 25-to-life term,[4] he asserts it is possible he will serve a longer sentence than a first degree murderer. Since we are unable to say, at this time, defendant's sentence, as applied to him, is unconstitutionally disproportionate (cf. *In re Rodriguez*

---

[3]We note that in *Harmelin* v. *Michigan* (1991) 501 U.S. __ [115 L.Ed.2d 836, 111 S.Ct. 2680], Justice Scalia concluded the Eighth Amendment contains no proportionality guarantee. However, Chief Justice Rehnquist was the only other justice to join in this portion of the opinion.

[4]An individual serving a straight life sentence is eligible for parole in seven years. (§ 3046.) A person sentenced to 25 years to life is eligible for parole in 16⅔ years. (§ 2931.)

(1975) 14 Cal.3d 639 [122 Cal.Rptr. 552, 537 P.2d 384]), we reject his claim of cruel and unusual punishment.

*Gun Use*

The People concede defendant was neither charged with nor found guilty of gun use within the meaning of sections 969d and 12022.5. Thus, the notation appearing on his abstract of judgment indicating that he used a weapon should be corrected.

DISPOSITION

Defendant's six-month sentence for violating section 12025 is stayed. The notation appearing on the abstract of judgment indicating he used a firearm should be stricken. In all other respects the judgment is affirmed.

Merrill, J., and Werdegar, J., concurred.

A petition for a rehearing was denied May 1, 1992, and appellant's petition for review by the Supreme Court was denied July 22, 1992.