Filed 1/21/21  P. v. Richardson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SCOTTY LEON RICHARDSON,<br><br>Defendant and Appellant. | D077377<br><br><br>(Super. Ct. No. SCE387410) |

APPEAL from a judgment of the Superior Court of San Diego County, Lantz Lewis, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Scotty Leon Richardson of attempted murder (Pen. Code,[1] §§ 664/187, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), driving a vehicle while having a blood alcohol level of 0.08 percent or more and causing injury (Veh. Code, § 23153, subd. (b)), corporal injury to a spouse (§ 273.5, subd. (a)), and violating a protective or stay-away order (§ 166, subd. (c)(1)).  After the jury was unable to reach a verdict on an allegation that the attempted murder was willful, premeditated, and deliberate (§ 189), the trial court declared a mistrial, and the allegation was dismissed.

On appeal, Richardson's sole contention is that his conviction for attempted murder was supported by insufficient evidence because he was under the influence of alcohol during the events in question and could not have formed the required specific intent to kill.  We affirm the judgment.

FACTUAL BACKGROUND[2]

At around 5:30 p.m. on January 10, 2019, Nathan C., the front desk clerk of the Budget Motel on East Main Street in El Cajon, was working at his usual station at a desk adjacent to the lobby when Richardson pulled into the motel parking lot in his white Chevy Malibu and strode into the lobby, open can of beer in hand.  Slurring his words and smelling of alcohol, Richardson insisted that Nathan kick his wife out of their shared room and off the property.  Nathan refused, telling Richardson that when one guest wanted another evicted, it was motel policy to ask both parties to leave. Nathan also told Richardson he could not drink alcohol outside his motel

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Because Richardson's appeal implicates the substantial evidence standard of review, we state the facts in the light most favorable to the judgment.  (*People v. Jennings* (2010) 50 Cal.4th 616, 638 (*Jennings*).)

room. Richardson swore and showed Nathan his middle finger, and then turned and walked to his motel room a few doors down.

Richardson was sharing the room with his wife, Joan, in violation of a domestic violence protective order issued after a May 2018 incident in which he had physically abused her. Richardson had, in fact, just returned from a court hearing in the domestic violence case; Joan later explained that he seemed to have been provoked by the realization that he was going to be required to take domestic violence classes. When Richardson entered the motel room, Joan was cooking dinner on a hot plate. Richardson told Joan he was going to kill her and throw her service dog on the freeway. He flipped Joan's hot food on her and her dog and shoved Joan against the wall, bruising her elbow. When Joan threatened to call the police, Richardson slapped his own face and threatened to report that she had hit him. He then took her cell phone and exited the room, yelling at her and carrying his beer.

Nathan, who walked with a cane due to a back condition, rounded a corner of the hotel's exterior in time to observe this scene. He told Richardson to take his beer back inside and quiet down. Richardson approached Nathan, called him a "redneck cowboy . . . piece of shit" and yelled at Nathan to get his wife out of the room and give him a refund. Nathan responded that if Richardson did not follow the motel's rules and return to his room, he would be evicted and Nathan would call the police. Richardson, who was taller and heavier than Nathan, yelled, "I could kill you. I'm 60-something years old. I got nothing to lose." Richardson put his hands on Nathan's chest and shoved him, causing Nathan to stumble backwards. A guest emerged from his room and distracted Richardson for long enough to allow Nathan to return to the office, where he called 9-1-1 and reported the incident. While Nathan was on the phone, Richardson drove away.

At around 6:45 p.m., while at his desk, Nathan received a call from Richardson. Richardson asked if "this [is] that cowboy son of a bitch" and told Nathan he wanted to talk to his wife. When Nathan refused to transfer the call to Richardson's room, Richardson told Nathan he was going to kill both Nathan and Joan as soon as they stepped off the hotel property.

The police responded to the motel at 7:13 p.m. and interviewed Joan and Nathan. As the officers were leaving the property, Nathan notified one of them about the death threats Richardson had made over the phone.

At around 8:00 p.m., Frank C. was walking near the motel when he heard tires squealing. He turned and saw a white sedan exiting the freeway. Frank thought the car was going to pass straight through the North Third Street intersection, but it turned at the last minute onto East Main Street. It looked for a moment as though the car was going to lose control, but it straightened out and continued down the wrong side of East Main Street before turning into the motel parking lot. Frank heard the sound of an impact.

Nathan was in the motel lobby when he was startled first by the sound of air rushing and then by the appearance of Richardson's car in the lobby about six feet from where he was sitting. A window frame hit his hat off, and he was pushed backward by the debris. When Nathan was interviewed by a police officer after the incident, he told the officer that if he had been seated in the area where Richardson had encountered him earlier that day, he would have been hit by Richardson's car. A video of this interview was played for the jury.

As the dust settled, Nathan saw Richardson in the drivers' seat with his eyes locked on Nathan. Richardson shook the steering wheel and screamed, "I'm going to fucking kill you. Why aren't you fucking dead? I

4

want to fucking die.  Just fucking die."  Nathan was afraid Richardson might be armed and scrambled out a back door.

Officer Steven Hannibal of the El Cajon Police Department happened to be driving by the motel just after 8:00 p.m. and saw that a car had crashed into the lobby.  He was the first to respond to the scene.  When he got to Richardson's car, Richardson was still seated in the drivers' seat.  Because the drivers' door was wedged against a wall and inaccessible, Hannibal opened the passenger door.  Hannibal put the transmission in park and took the keys out of the ignition.  Although Richardson smelled of alcohol, he was conscious and able to speak and respond to questions.  Hannibal asked for Richardson's name, and Richardson gave it to him.  Hannibal asked for his identification, and Richardson indicated where it might be.  Hannibal asked if he was hurt, to which Richardson responded, "I don't care.  I don't want to live no more.  I'm tired."  The fire department had to remove Richardson from the car.  As Richardson was being removed, he rambled incoherently and slurred his words, and once he was out of the car, he needed assistance to walk.

Nathan testified that Richardson yelled "[h]ow are you alive?" when he saw Nathan later, although Hannibal did not recall hearing Richardson say these words.

Officer Stephen Schindler of the El Cajon Police Department, one of the officers that had interviewed Joan and Nathan earlier that day, arrived at the motel at approximately 8:05 p.m. in response to a call from another officer.  Schindler saw a Chevy Malibu sitting halfway through the wall of the front lobby.  He observed that the weather conditions were clear, the ground was dry, and there were no skid marks on the pavement near the site of the collision.  Schindler remained with Richardson for approximately four hours.

5

During this period, Richardson was able to converse with Schindler and follow directions, and he did not lose consciousness or pass out. Schindler was present when Richardson was given the option to give a breath or blood sample for alcohol testing. He gave a two-word response: "fuck you." When Schindler served Richardson with an emergency protective order with respect to his wife, Richardson said, "I wish he was dead."

Richardson had no apparent injuries from the collision but was transported to the hospital after complaining of chest pain. A San Diego Sheriff's Crime Lab criminalist testified that a blood test taken four hours after the collision revealed Richardson's blood alcohol content to be 0.124 percent, which for a man of his size was the equivalent of six to nine drinks. According to the criminalist, depending on the timing of Richardson's last drink, his blood alcohol content at the time of the collision could have been as low as 0.13 percent or as high as 0.22 percent. Although the criminalist could not say how this amount of alcohol might affect any particular individual, she agreed that alcohol generally impairs a person's driving ability, reaction time, and capacity to make rational decisions. Schindler likewise testified that alcohol affects judgment and ability to drive.

Nathan was taken by ambulance to a hospital to be treated for a back injury he suffered in the immediate aftermath of the incident. He was diagnosed with an acute lumbosacral thoracic strain and was given shots to stop his back spasms. He continued to be affected by the injury months later.

Richardson's car was equipped with an event data recorder (EDR), a device that collects data from certain vehicle systems and stores the data if the vehicle is in a collision. A San Diego Sheriff's Department collision reconstruction expert downloaded and analyzed the data from the EDR in Richardson's car. The expert testified that between five and four seconds

6

before impact, the driver was depressing the brake pedal and was not depressing the gas pedal; during this interval, the car slowed from 25 to 19 miles per hour. Starting at the third second before impact, however, and continuing through the first second before impact, the driver's foot was off the brake pedal and was depressing the gas pedal "all the way." During this interval, the car accelerated from 19 to 39 miles per hour. On cross-examination, the accident reconstructionist agreed he could not determine from this data whether the driver was acting under the influence of alcohol.

Richardson's car was inspected by a mechanic employed by the City of El Cajon, who testified that the vehicle's brakes and throttle system appeared to be functioning properly, and that there was no observable mechanical failure that would cause a loss of ability to control the vehicle.

The jury was instructed on the legal significance of evidence of a defendant's voluntary intoxication pursuant to CALCRIM No. 3426.

## DISCUSSION

Richardson argues that the evidence of his intoxication fatally undermines any inference that he acted with the specific intent to kill Nathan when he crashed his car through the lobby wall. According to Richardson, he had no motive to kill Nathan, his threats to kill Nathan were mere "drunken rambling," and because he was driving under the influence of alcohol, it is more likely he simply lost control of his car rather than crashed into the motel intentionally. If he did crash his car intentionally, Richardson further maintains, he was likely intending to kill himself, not Nathan.

The People respond that Richardson's specific intent to kill Nathan was supported by sufficient evidence of Richardson's motive, purposeful actions, and statements, and that the jury was instructed and presented with

7

evidence of Richardson's voluntary intoxication and properly rejected this defense.

I.    *Applicable Legal Principles*

A.    *Standard of Review*

In considering a claim of insufficient evidence, we "review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt." (*Jennings*, *supra*, 50 Cal.4th at p. 638.)  "We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence," but we do not reweigh the evidence or reevaluate the credibility of the witnesses.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  To prevail on a substantial evidence challenge, a "defendant must establish that no rational jury could have concluded as it did—it does not matter that 'the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime . . . .' " (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 9-10.)  Moreover, because " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial . . . circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055, quoting *People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

B.    *Specific Intent to Murder*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  The mental state of specific intent to kill is "coincident with express malice." (*People v. Guerra* (1985) 40 Cal.3d 377, 386; *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*)

8

(["Intent to unlawfully kill and express malice are, in essence, 'one and the same.' "].) " 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' " (*Smith*, *supra*, at p. 741; accord *People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.) "[A] defendant's statement of intention to kill a person has been found sufficient to prove intent to kill in the context of attempted murder." (*People v. Morales* (1992) 5 Cal.App.4th 917, 925-926 (*Morales*).) Evidence of a motive to kill may also be probative of a specific intent to kill, although "[o]ne may kill with or without a motive and still be found to have acted with express malice." (*Smith*, *supra*, at pp. 742-741.)

C.   *Voluntary Intoxication*

Evidence of voluntary intoxication is relevant to whether a defendant actually formed a required specific intent. (§ 29.4, subd. (b).) Voluntary intoxication is not a complete defense to a crime, but "rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt." (*People v. Saille* (1991) 54 Cal.3d 1103, 1120.) Thus, "a jury need not accept an intoxication defense." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.) Rather, the jury may give evidence of intoxication " 'whatever weight it deems appropriate in light of the evidence as a whole.' " (*Ibid.*, quoting *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088.) When evidence of intoxication is presented to a properly-instructed jury for the purpose of determining whether the defendant had the intent to commit the crime charged, the verdict will not be disturbed if the facts are sufficient to support the implied finding that the defendant acted with the required specific intent. (*People v. Coleman* (1942)

9

20 Cal.2d 399, 409, overruled in part on other grounds by *People v. Wells* (1949) 33 Cal.2d 330, 355.)

II.     *Analysis*

Applying the foregoing legal principles to this case, we agree with the People that the record provides ample support for the jury's implicit determination that Richardson was capable of forming, and did form, the specific intent to murder Nathan despite his intoxication.

Although motive evidence is not necessary to convict a defendant for attempted murder, evidence of motive may be probative of an intent to kill. (*Smith*, *supra*, 37 Cal.4th at pp. 742-741.)  Here, contrary to Richardson's contention otherwise, the jury was presented with evidence from which it could properly conclude he had a motive to kill Nathan.  "[T]he law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine' may be sufficient [citation]." (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102.)  The jury heard that Richardson had several heated conflicts with Nathan the day of the incident, including one in which he assaulted Nathan.  Whatever the original cause of Richardson's anger may have been, he was consistent and unrelenting in directing his aggression at Nathan; he used openly hostile language, threatened Nathan multiple times, and showed through his conduct that he was willing to physically harm Nathan.  Richardson's anger at Nathan was amply demonstrated by the evidence and supplied a motive to kill that the jury could properly consider in determining that Richardson acted with the required *mens rea*.

A defendant's intent to kill may also be inferred from his actions. (*Smith*, *supra*, 37 Cal.4th at p. 741.)  Here, the EDR data showed that three

10

seconds before the collision, Richardson took his foot off the brake and fully depressed the gas pedal, increasing his speed from 19 to 39 miles per hour.[3] This behavior was consistent with Richardson making a conscious decision, three seconds before the collision, to accelerate his car toward the motel wall. The location of the impact was also telling; Richardson crashed his car into the area of the lobby where he had encountered Nathan earlier that day. Taken together, these facts supported the inference Richardson purposely crashed his car into the motel lobby, and that his intended target was Nathan.

Richardson argues that the manner in which he drove his car is susceptible of one or more innocent explanations. He points out he was intoxicated and surmises that he may have lost control, or that his foot may have slipped off the brake or onto the gas. He further contends he may have been intending to kill himself rather than Nathan. However, we indulge all inferences in favor of the judgment, not against it; that the evidence arguably supports a non-culpable inference as well as a culpable one is not a basis for reversal. (*Jennings*, *supra*, 50 Cal.4th at pp. 638-639.)

Richardson also claims he could not have intended to kill Nathan by driving through the lobby wall because it would have been impossible for him to kill Nathan in this manner. He maintains he had no way of knowing whether Nathan would be in the lobby, and that killing Nathan by crashing his car through the wall would have been impossible since Nathan could have simply "move[d] out of the way." This argument ignores the facts as well as

---

[3]    In his reply brief, Richardson claims the accident reconstruction expert did not testify that Richardson was stepping on the gas pedal during the last few seconds before the collision. Richardson is simply incorrect in this regard; the expert did, in fact, agree that the data showed the gas pedal was depressed all the way for the three-second period prior to impact.

11

the relevant legal standard. The crime of attempt does not require evidence the defendant's efforts were certain to bring about their intended result. Rather, "a defendant may be convicted of an attempt to commit a crime where there is sufficient evidence to demonstrate that the means used by the defendant, together with the surrounding circumstances, made the intended crime apparently possible." (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1383-1384.) The evidence showed that Richardson had seen Nathan working in the lobby earlier that day, and he therefore had a basis for believing Nathan might be there at the time of the collision even if he could not predict this to a certainty. As for Richardson's claim that Nathan could have simply moved out of the car's path, this contention ignores Nathan's description of the suddenness of the collision as well as Nathan's later statement to the interviewing police officer that he believed he would, in fact, have been hit by Richardson's car if he had been seated in his usual location.

Moreover, Richardson's arguments ignore his numerous threats on Nathan's life, which served as telling evidence of his intent to kill. (See *Morales*, *supra*, 5 Cal.App.4th at pp. 925-926 [noting that a defendant's statement of intention to kill a person has been found "sufficient to prove intent in the context of attempted murder"].) Richardson threatened to kill Nathan several times before the collision; immediately after the crash, he expressed frustration that Nathan had survived and continued to threaten Nathan's life. Richardson counters that the jury's inability to reach a verdict on the willful, deliberate and premeditated allegation indicates it did not believe Richardson's pre-collision threats to kill Nathan were sincere. Even so, this still leaves Richardson's post-collision statements, which the jury could, and implicitly did, regard as credible evidence of Richardson's state of mind when he drove his car through the lobby wall. And while Richardson

12

characterizes his threats as mere "drunken rambling," the weight of the evidence showed otherwise.

Richardson contends his "extreme intoxication" at the time of the incident undermines any inference he acted with the specific intent to kill Nathan. However, Richardson fails to identify any facts indicating he was too impaired at the time of the collision to form the specific intent to murder. True, the jury heard that alcohol can hinder judgment, and after the crash, Richardson was slurring his words, at times rambled incoherently, and needed assistance to walk. However, the evidence also demonstrated that immediately after the crash, Richardson was conscious, aware of Nathan's presence, and able to articulate his indignation that Nathan was still alive. The evidence also showed Richardson was able to reason and interact appropriately with Officers Hannibal and Schindler. There was thus evidence of reasonable, credible, and solid value that at the time of the collision, Richardson was conscious and able to appreciate what was happening, and that his cognitive abilities remained intact despite his intoxicated state. (*Jennings*, *supra*, 50 Cal.4th at p. 638.)

Accordingly, substantial evidence supported the jury's implied determination that Richardson acted with the specific intent to kill when he crashed his car into the lobby of the motel.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:



BENKE, Acting P. J.



DATO, J.