Filed 7/15/24  P. v. Grajeda CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GERARDO RODRIGUEZ GRAJEDA,<br><br>    Defendant and Appellant. | 2d Crim. No. B321230<br>(Super. Ct. No. 2018035973)<br>(Ventura County) |

Appellant Gerardo Rodriguez Grajeda drove an SUV through an intersection in downtown Oxnard and ran over Jorge Tejeda, killing him.  At the police station the next day, appellant broke a window by kicking it.  He later jumped a fence in the station's private parking lot and was captured a block away. Appellant was convicted, by jury, of second degree murder (Pen. Code, § 187, subd. (a))[1], misdemeanor vandalism (§ 594, subd.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

(b)(1)) and misdemeanor resisting arrest. (§ 148, subd. (a)(1).) The jury found that appellant personally used a deadly weapon in committing the murder (§ 12022, subd. (b)(1)), but found not true the allegation that the murder was willful, deliberate and premeditated. The trial court sentenced appellant to 15 years to life on the murder conviction, plus one year on the deadly weapon allegation, and time served for the misdemeanors.

The sole contention raised on appeal is whether the prosecuting attorney committed misconduct in his closing and rebuttal arguments. He argued that appellant's accident reconstruction expert, Jason Fries, concluded the collision was an accident because the expert had a financial bias. The prosecutor described Fries' reconstruction videos as "cartoons" that ignored crucial evidence by failing to consider appellant's behavior in the minutes before the collision. Noting that Fries was paid $17,000 for his testimony, the prosecuting attorney argued, "So if Jason Fries is able to convince a jury that he's not guilty of murder, how much in demand would Jason Fries's services be when the word of something like that gets out?" Appellant contends this was misconduct because the argument urged jurors to consider the consequences of a not-guilty verdict and to convict appellant so that other, guilty people would not go free. We affirm.

*Facts*

Because appellant raises only one issue relating to the closing arguments, our summary of the facts will be brief and will focus on the expert witness testimony and portions of the closing arguments relating to that testimony.

After spending the evening out, Jorge Tejeda, his twin brother Daniel and two friends ended up at Taco de Mexico, a taco restaurant in downtown Oxnard. Their car was parked in

2

a nearby alley.  The group left the restaurant after about an hour and walked back toward their car.  On the way, they saw a group of men, including appellant, beating another man.  Appellant was kicking and punching the man who was on the pavement.

Christian Navarro, the victim of that beating, testified that appellant approached him in the alley and asked if Navarro was "messing with" his girlfriend.  Someone hit Navarro who blacked out.

As Tejeda and his companions walked to their car, appellant approached them very aggressively.  He asked Antonio Zazueta, one of Tejeda's companions, "Where are you from." Zazueta replied that they weren't from anywhere; they were just there to have fun and didn't want any trouble.  Appellant said they weren't answering his question and reached for something in his back pocket.  Jorge Tejeda punched appellant.  Appellant removed his belt which had a heavy buckle and used it to swing at Jorge Tejeda.  Eventually, Zazueta got the belt away from appellant and threw it away.

While this was happening, Daniel Tejeda noticed a group of men running toward them.  Daniel shouted that they should run.  As they did so, Zazueta heard appellant say, "You will see now, motherfuckers.  You are going to pay for it."  A bystander who was waiting for food at the taco restaurant heard appellant say, "I'm going to kill you all, motherfuckers."

Jorge and Zazueta were running together.  Appellant went looking for them in his Jeep Cherokee.  At some point, an acquaintance of appellant's, Robert Villaruel, got in the Jeep to join the chase.  When they spotted Jorge and Zazueta, Villaruel jumped out of the Jeep to chase them on foot.  Zazueta ran through the intersection and onto some train tracks.  Jorge, who

was tired from running, tripped. As he was getting up, Villaruel "body slam[med]" him back down to the pavement.

Bystanders saw appellant make a U-turn and then accelerate toward the intersection. He paused briefly as Villaruel jumped out of the way. Then, appellant drove through the intersection, hitting Jorge and running over him. The bystanders described appellant driving toward Jorge rather than trying to avoid a collision. After hitting Jorge, appellant drove off without stopping.

<u>Expert Witnesses</u>

Oxnard police officer Justin Songer performed a sight distance analysis of the intersection to identify what appellant, as a driver, saw or reasonably could have seen at about the time of the collision. Using appellant's own SUV, Songer and two volunteers who were approximately the size of the victim and Villaruel reenacted the incident to determine when appellant might reasonably have seen the victim. Songer opined that an "expectant driver" would be able to see people in the intersection from a distance of 531 feet. He estimated that a less observant driver could have seen people in the intersection at 357 feet. The victim and Villaruel would have been fully illuminated by the headlights of appellant's SUV within 37.9 feet of the point of impact.

Richard Godfrey, an accident reconstruction expert, disagreed with most of Songer's opinions. He opined that, if the SUV was traveling at 22 miles per hour when it neared the intersection, and appellant saw the victim at from a distance of 37.9, he would not have been able to stop in time to avoid the collision with the victim.

4

Appellant's second accident reconstruction expert, Jason Fries, used security camera video obtained from several area businesses and laser scans to create a virtual model of the intersection and an animated reconstruction of the collision. Fries opined that appellant was traveling at 22 miles per hour as he approached the intersection. He applied the brakes and decelerated to 20.6 miles per hour and then 17.7 miles per hour before braking as hard as possible in the intersection. The Jeep was traveling at 8.8 miles per hour when it hit Jorge. Fries opined that, as Jorge was getting up from the pavement, he stumbled forward and put himself in the path of the Jeep just 0.4 seconds before the collision. Appellant would not have had enough time to perceive Jorge and react before hitting him. The collision was, in Fries' opinion, unavoidable.

The animation also showed that, rather than traveling in a straight line through the intersection, appellant steered or swerved in the direction of the victim. Fries opined that appellant had been preparing to make a left turn when he entered the intersection; his path of travel was consistent with turning into the far east lane of the cross street. Fries was paid $17,000 for his services.

Closing Arguments

In his closing argument, the prosecuting attorney described appellant as aggressively looking for a fight when he approached Jorge and his companions that night. Jorge hit appellant, who then vowed to kill Jorge. He used his car to stalk Jorge through the streets and alleys of downtown Oxnard and then to murder him. Appellant was a "bundle of anger, and that's why Jorge Tejada is dead, not because of some accident that Fries wants you to show you some cartoons and try and tell

5

you that your brain didn't process what it did. Your eyes didn't see what it did, and your ears didn't hear what it did." The prosecutor referred to Fries as a "smooth witness," a "good talker," and a "professional expert" who was both "charming" and "extremely bias[ed]." Fries was "biased to tell you how none of this was the defendant's fault, that the victim just stepped in his pathway."

In his rebuttal argument, the prosecutor repeated his claim that Fries had a financial bias which explained the opinion that the collision was an accident. "[H]e makes $17,000 for this case. He testifies all over. We have a case where the defendant stated what his intent was. He was looking for a fight that night. That's very clear. When he lost, he said multiple times that he's going to kill. [¶] He pursued the victims. He pursued the victims throughout downtown Oxnard, for over a third of a mile, and then he struck and killed the person he said he was going to kill, the person he had fought with."

The prosecutor continued, "So if Jason Fries is able to convince a jury that he's not guilty of murder, how much in demand would Jason Fries' services be when the word of something like that gets out?" Appellant's counsel objected that this was improper argument; the objection was overruled. Returning to his theme, the prosecutor argued, "What happens if the next guy who gets mad and runs someone over is a hedge fund man . . . ." Appellant's counsel objected again and was again overruled. The prosecutor concluded this portion of the argument by stating, "So of course he wants to win, and you could tell by his attitude on the stand he was biased."

6

*Discussion*

The standards for establishing prosecutorial misconduct or error are settled. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) A prosecutor violates the federal constitution "when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.'" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853 (*Daveggio and Michaud*), quoting *People v. Lightsey* (2012) 54 Cal.4th 668, 718.) The error "must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202 (*Cole*), quoting *United States v. Agurs* (1976) 427 U.S. 97, 108.) Comments by the prosecutor violate state law, even if they do not violate federal constitutional standards, if the prosecutor uses "deceptive or reprehensible methods [to attempt]t to persuade [either] the court or jury." (*People v. Watkins* (2012) 55 Cal.4th 999, 1031; *Daveggio and Michaud, supra*, at p. 854.)

Claims of prosecutorial misconduct are reviewed under an abuse of discretion standard. Appellant has the burden to establish that "there is a reasonable likelihood the jury construed the remarks in an objectionable fashion . . . ." (*People v. Dworak* (2021) 11 Cal.5th 881, 910 (*Dworak*).) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. . . ." (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

A prosecutor has wide leeway in closing argument to state his or her views regarding the evidence. (*People v. Panah* (2005) 35 Cal.4th 395, 463.) ""'The argument may be vigorous as

7

long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. . . .”’”” (*People v. Hill* (1998) 17 Cal.4th 800, 819.)  This means that prosecutors may point to an expert witness' financial bias and argue, if supported by the evidence, “‘“that a witness's testimony is unbelievable, unsound, or even a patent ‘lie.’”’”” (*Dworak, supra,* 11 Cal.5th at p. 910; *People v. Sandoval* (1992) 4 Cal.4th 155, 180.)

It is, however, improper for the prosecutor to misstate or mischaracterize the evidence, or to base an argument on facts that are not in evidence.  (*People v. Parson* (2008) 44 Cal.4th 332, 360.)  Because jurors may not be influenced by prejudice or public opinion, it is error for the prosecutor suggest that they might face “social pressure and community obloquy” if they reach the “wrong” verdict.  (*People v. Shazier* (2014) 60 Cal.4th 109, 145; see also *People v. Morales* (1992) 5 Cal.App.4th 917, 928 [misconduct to invite jurors to “disregard instructions and consider public opinion” in reaching their verdict].)  Federal courts also hold that a prosecutor may not “‘urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking,’” nor may a prosecutor “ ‘point to a particular crisis in our society and ask the jury to make a statement’ with their verdict.”  (*United States v. Sanchez* (9th Cir. 2011) 659 F.3d 1252, 1256 (*Sanchez*).)

Here, the prosecutor argued that Fries was not a credible expert because he had an obvious financial bias and because he ignored crucial evidence, including evidence that appellant had threatened to kill the victim, was purposefully searching for him and intentionally steered his SUV toward the victim rather than maintaining a straight line of travel through

8

the intersection.  This was proper commentary on the witness' bias and credibility.

Appellant contends the prosecutor committed misconduct when he said, "So if Jason Fries is able to convince a jury that he's not guilty of murder, how much in demand would Jason Fries' services be when the word of something like that gets out?"  We disagree.  This statement refers to the witness' financial incentive to conclude that the collision was an unavoidable accident.  It was not misconduct to point out that the witness' reputation would be bolstered by a favorable result in this case.

We reach the same conclusion with respect to the prosecutor's comment, "What happens if the next guy who gets mad and runs somebody over is a hedge fund man . . . . [¶]  [¶]  So of course [Fries] wants to win, and you could tell by his attitude on the stand he was biased."  Again, the comment refers to the witness' financial bias.  It does not urge jurors to base their verdict on the possibility that an acquittal would allow future guilty defendants to go free.  There is no reasonable likelihood the jurors would have understood this statement to mean that an acquittal in this case would allow a guilty "hedge fund man" to avoid punishment in the future.

For similar reasons, we conclude the prosecutor's comments did not amount to a federal due process violation.  The prosecutor's argument focused on the expert's financial bias and failure to consider relevant evidence.  These issues are fair game.  He did not urge the jury to send a message to future other drivers or to convict appellant to preserve civil order, protect community values or deter future lawbreaking.  (*Sanchez, supra*, 659 F.3d at p. 1256.)  The comments were also brief, not

9

inflammatory and relatively mild. They did not "'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.'" (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 854.)

We conclude the prosecutor's closing and rebuttal arguments did not "infect the the trial 'with such unfairness as to make the conviction a denial of due process' [citation] or involve 'the use of deceptive or reprehensible methods to attempt to persuade . . . the jury' [citations]. We presume the jurors treated 'the prosecutor's comments as words spoken by an advocate in an attempt to persuade' [citation], and we find nothing in the record that would suggest otherwise." (*Cole, supra,* 33 Cal.4th at p. 1204.)

*Conclusion*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


CODY, J.

10

Ryan J. Wright, Judge

Superior Court County of Ventura

_____

Dwyer + Kim and Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.